James DAVIS et al., Appellants,

v.

TRAVIS COUNTY CHILD WELFARE UNIT, Appellee.

No. 12702.

Court of Civil Appeals of Texas, Austin.

March 15, 1978.

Barbara Hines, Regina Lynn Rogoff, Legal Aid and Defender Society of Travis County, Austin, for appellants.

Jed I. Oliver, Austin, for appellee.

SHANNON, Justice.

This appeal concerns termination of parent-child relationships. Tex.Family Code Ann. § 15.02 (Supp.1978).

Appellee, Travis County Child Welfare Unit, filed suit in the district court of Travis County seeking termination of the parent-child relationship between Kellie Wynell Duncan, aged four years, and her parents, Allen Duncan and appellant, Jane Duncan. Appellee also sought termination of the parent-child relationship between Lillian Davis, aged two years, and her parents, appellants James Davis and Jane Duncan. Allen Duncan, although served, made no appearance. Appellants, to the contrary, appeared in person and through counsel.

As grounds for termination, appellee alleged (1) that the parents engaged in conduct which endangered the physical or emotional well-being of the children, and (2) that the parents knowingly allowed the children to remain in conditions and surroundings which endangered the physical or emotional well-being of the children. Appellee also alleged that termination of the parent-child relationship was in the best interest of the children.

After trial to the court, judgment was entered terminating the parent-child relationship between the girls and their parents. We will affirm that judgment.

Upon request, the district court filed thirty-three findings of fact and conclusions of law. The court found, among other things, that Jane Duncan and James Davis engaged in conduct which endangered the physical and emotional well-being of the children. The court also found that those persons knowingly allowed the children to remain in conditions and surroundings which endangered their physical and emotional well-being. In addition, the court determined that termination of the parental rights of Jane Duncan and James Davis to the children was in the best interest of the children.

Appellants attack the judgment by sixty-eight points of error. Point of error one complains that the court erred in failing to make a separate finding that each parent had knowingly allowed each child to remain in conditions or surroundings that endangered the physical or emotional well-being of each child. Point of error two is that the court erred in failing to make a separate finding that each parent engaged in conduct that endangered the physical or emotional well-being of each child. The points of error are overruled. Should a party deem the initial findings or conclusions of the court incomplete, incorrect, or overly general, he may request the court to make specified further, additional, or amended findings. Tex.R.Civ.P. 298; 4 McDonald, *Texas Civil Practice* § 16.07 (1971 rev. vol.). Examination of the transcript shows that appellants did not request the court to make further, additional, or amended findings, the absence of which is now the subject of complaint on appeal. Whatever complaint appellants may have had with respect to the over-generality of the court's findings, was waived by their failure to request further findings.

The remaining sixty-six points of error attack the court's termination of the parent-child relationships. Tex.Family Code Ann. § 15.02 (Supp.1978) empowers the court to grant a petition terminating the parent-child relationship upon the finding that:

"(1) the parent has:

.        .        .        .        .

"(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

"(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which en-

dangers the physical or emotional well-being of the child; or

"(K) . . . and in addition, the court further finds that

"(2) termination is in the best interest of the child."

Appellants' claim that the judgment is supported by no evidence or that the judgment is so contrary to the great weight and preponderance of the evidence so as to be manifestly unjust. In determining whether there is any evidence to support the judgment, it is proper to consider only that evidence most favorable to the finding and disregard entirely that which is opposed to it or is contradictory in its nature. *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696 (1914); *Renfro Drug Co. v. Lewis,* 149 Tex. 507, 235 S.W.2d 609 (1950). In reviewing factual sufficiency points of error the court considers all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence so as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

The melancholy plight of Kellie Duncan and Lillian Davis was brought to appellee's attention in June of 1976. When Jennie Turner, a social worker, arrived at appellants' quarters, a motel in Austin, she found Jane Duncan and the two children in a small and dirty room. Scattered about the room were piles of opened tin cans and used paper plates. Mrs. Duncan and the children were "quite dirty." Lillian was asleep on a bare mattress. Mrs. Duncan had no control over her physical movements. She shook violently. When she tried to put her hand on her hip, she could not locate her hip. She attempted to light a cigarette, but found that task impossible. When Mrs. Duncan was asked a question, her mouth would open and move, but she could make no sound. Mrs. Duncan was completely incoherent and uncontrolled. In that connection, the evidence was that she could not control her bowel movements during the interview. The social worker observed that Kellie seemed to be caring for her mother. Mrs. Duncan finally succeeded in making

known to the social worker that she had failed to take her medication and that such failure was the reason for her then physical condition.

The social worker observed that Kellie had bruises and small circular scars on her legs and a clearly defined belt mark between her shoulder blades. The social worker testified that Mrs. Duncan could not take care of herself or the children. In sum, the social worker testified that she had never before observed such a frightening situation for small children.

The children were taken by appellee to Dr. Stephen Griggs, a pediatrician. Dr. Griggs testified by deposition that he examined the children. Both Kellie and Lillian were underweight and undersized. They suffered from poor nutrition, poor skin hygiene, and poor dental hygiene. Kellie appeared withdrawn and somewhat fearful of adults. Kellie's examination showed multiple skin scars located primarily on the legs. Kellie's left leg had about twelve old circular burn scars and bruises about the knee. Her right leg had about ten old circular, possibly burn scars. She had a recent linear burn on her right leg about two centimeters in length. The circular burns were similar to a burn that could be caused by cigarette burns. Although Dr. Griggs admitted that he could not testify conclusively that the circular scars were cigarette burns, he did testify that in his "best medical opinion" the circular scars were burn scars. The right second toe was badly infected and swollen. Her back was scratched and there was located a large area of petechia or hematoma. Petechia or hematoma was also present on Kellie's right shoulder and left chest. Dr. Griggs defined petechia as consisting of very small bruises in groups. Petechia indicates repeated trauma or blows to the same area of the body. Dr. Griggs also testified that Kellie failed the "Denver Developmental Screening Test." That test is a standard test designed to test the development of certain motor skills.

Jane Duncan was thirty-three in June of 1976. She has a long history of mental illness. She suffers from a mental condi-

tion originally diagnosed as schizophrenic reaction, paranoid type and more recently diagnosed as chronic schizophrenia, undifferentiated type. She has been hospitalized frequently for treatment of the mental condition and for alcoholism. Mrs. Duncan started drinking at age sixteen and drinking has been a problem since age eighteen. In 1973, she said that she had been taking diet pills, amphetamines, "speed," and smoking "pot" since she was eighteen. Mrs. Duncan stated, however, that she did not smoke "pot" every day. In 1975, Mrs. Duncan was admitted to the Wichita Falls State Hospital. At that time she was suffering from delusions and auditory and visual hallucinations. She heard voices and saw persons that did not exist. She thought her husband had shot Kellie in the foot, and, as proof of that supposed fact, she pointed to a small pimple on the child's foot, declaring that the pimple was the bullet hole. Mrs. Duncan thought that she had been run over by an automobile, when in truth, she had not. She also thought that someone had kidnapped Kellie and had "shell-shocked" Kellie. Mrs. Duncan was "put on" major tranquilizers which tend to produce an antipsychotic effect. At one time, Davis characterized Mrs. Duncan as an "idiot." At that time Davis did not think Mrs. Duncan was mentally capable of adequately caring for Lillian.

Later, when Mrs. Duncan lived in Houston, she was placed in a mental hospital for treatment. After appellee took the children in June of 1976, Mrs. Duncan was placed in the Austin State Hospital. Upon admission, Mrs. Duncan complained of visual and auditory hallucinations, that she had been "hearing voices and seeing people."

Mrs. Duncan was first married at age sixteen. She has been married seven times, three times to one man and twice to Allen Duncan. At time of trial she was still married to Duncan, but she was living with James Davis who had fathered Lillian. Besides Kellie Duncan and Lillian Davis, Mrs. Duncan had a son by a previous husband. The son was adopted by Mrs. Duncan's sister.

Several social workers from Hale County testified by deposition. In February of 1973, Jane Duncan and Allen Duncan lived in Plainview. During that month Mrs. Duncan appeared at the Hale County Welfare Office requesting that the office take custody of Kellie for the reason that she had no one to care for the child and that she was afraid to leave Kellie at the house for fear that Allen Duncan while drunk would harm the child. On that occasion Mrs. Duncan stated that she had left her husband's house and had no place to go. The welfare officer placed Kellie in a foster home, but a few days later Allen Duncan obtained the child by court order. Later Mrs. Duncan came to the welfare office stating that she had no place to go and nothing to eat. At that time she was referred to the Salvation Army. For about three months Mrs. Duncan would appear in Plainview for a few days and then disappear. On occasion she would take the infant with her and hitchhike to towns around Plainview, only to reappear in Plainview worn out and exhausted. When the infant was in Plainview, the infant would stay with a baby-sitter during the day and with Allen Duncan during the evening.

In the spring of 1973, Mrs. Duncan hitchhiked away from Plainview. Later it was learned that she had been treated in the Alcoholic Ward at the Wichita Falls State Hospital. She returned to Plainview in August, 1973. She then left Plainview with Kellie in the middle of September. The welfare office made unsuccessful efforts to locate her and the child. Mrs. Duncan and Kellie returned to Plainview on October 25, 1973, and remained with Duncan for about two months. Mrs. Duncan and Kellie then disappeared from Plainview on December 20, 1973, and were seen no more in Hale County.

Mrs. Duncan and Kellie next appeared in Wichita Falls where mother and child were living with James Davis. The evidence indicates that Mrs. Duncan first met Davis when they were alcoholic patients in the Wichita Falls State Hospital in the spring

of 1973. Lillian Davis was born in Wichita Falls on May 15, 1974.

Davis has suffered from acute alcoholism for many years. Davis drinks in "sprees." He remains sober for a month or so and then drinks unceasingly for a week or so. At the end of the spree, Davis is usually very ill and often requires hospitalization. Davis was hospitalized for alcoholism in Venta, Oklahoma in 1968; twice in Benton State Hospital in Arkansas in 1969; in the Los Angeles General Hospital in 1971; and in the Norman State Hospital in 1973. Since Kellie Duncan and Lillian Davis have lived with him, Davis has been hospitalized for alcoholism twice in 1974 and once in 1975. After appellee took the children, Davis was hospitalized for alcoholism twice.

In December, 1974, Helen Douglas Hicks, a social worker in Wichita Falls called upon Mrs. Duncan for a "home visit." Mrs. Hicks testified by deposition that when she came to the door a "nauseous, unpleasant odor" emanated. Filth, debris, trash, and food wastes were scattered about the small house. Lillian lay on a "very dirty couch." The couch was "stained, filthy, with what appeared to be urine and food and possibly milk." The child was wrapped in a "real dirty blanket." The child appeared lethargic to Mrs. Hicks. Kellie was running about the house. Although it was December, Kellie was dressed in a dirty thin dress, with no underclothing, no socks, and no shoes. Kellie's buttocks were covered with sores. Davis staggered out of the bedroom and appeared to be drunk. He was made "very angry" by Mrs. Hicks' visit. There were between forty and fifty beer cans scattered about the room.

Valerie Dorothy Wise, a baby-sitter for Lillian in Wichita Falls, testified by deposition. On occasion, when Davis came to pick up Lillian, Davis was drunk. When he would leave with Lillian in his arms Davis would ". . . stagger out and could hardly get down the steps without falling." Mrs. Wise described Lillian as being underweight and dirty. Lillian appeared to have ". . . maybe milk or something caked in her hair and her clothes and her little feet and arms and hands would be just black . . ." At times without prior arrangement, Mrs. Wise would have to keep Lillian overnight because Davis would not come for her.

Dr. J. B. Hathorn is a physician specializing in "family practice" in Wichita Falls. Dr. Hathorn, by deposition, testified that he delivered Lillian Davis. During the first several months of her life Lillian had a "very poor weight gain." Because of Lillian's failure "to thrive," Dr. Hathorn caused her to be placed in the hospital. Lillian was malnourished. Lillian did not eat well in the hospital at first because she did not appear "to know how to eat." Afterward, Lillian gained weight rapidly in the hospital. Dr. Hathorn was of the opinion that Lillian's failure to thrive was the result of her mother's failure to feed her adequately.

Dorothy Frances Dummit and her husband, John Dummit, operate the motel in Austin where appellee found the children and Mrs. Duncan. Davis and Mrs. Duncan lived perhaps as long as two months in the motel before they were asked to leave. They were asked to leave the motel, because ". . . Mr. Davis was drinking, and he didn't have no work, and he couldn't pay his rent." The Dummits and Davis also parted company for the reason that Davis ". . . tried to get one of the tenants that lived at the motel at the time to make a bomb to blow up my [Mrs. Dummit's] car and my home."

Mrs. Dummit described Kellie as ". . . awful dirty; her hair was awful dirty, and it was matted up." Kellie came to play with Mrs. Dummit's nephew. Kellie was so filthy that Mrs. Dummit gave her a bath and shampoo. Kellie had bruises on her legs and back. Mrs. Dummit had ". . . never seen a child bruised like that before." One day Mrs. Dummit saw Mrs. Duncan carrying Lillian by the child's throat. "She [Mrs. Duncan] had it around the throat. The arm was under the throat like that." There was no support for the child's body. Mrs. Dummit "hollered" at Mrs. Duncan, but Mrs. Duncan ". . . never answered me in words; she just

grunted at me." Mrs. Dummit testified that Mrs. Duncan ". . . just shook an awful lot at all times, and she was sick in some way."

A psychologist with the Austin Child Guidance Center, Douglas Faust, testified that Kellie suffers a "developmental lag" in "emotional areas." Kellie has lacked a "supportive" environment in which to receive intellectual stimulation. Faust testified that Kellie needs emotional support. Faust claimed that a change in Kellie's environment is necessary. If Kellie is permitted to remain with Davis and Mrs. Duncan, she will fall into a continuously lower pattern of behavior and intellectual abilities.

In August of 1976, Laurence I. Kihnel who is with the child and family consultation team with Mental Health Mental Retardation saw Mrs. Duncan at the motel. Mrs. Duncan was "tremoring" and was in no condition to take care of the children.

Joe Wagner is an investigator for the Welfare Department. Wagner reported that Kellie and Lillian had been left by appellee's employee with Mrs. Duncan for a home visit on November 24, 1976. When appellee's employee returned to pick up the children, Mrs. Duncan and the children were gone. Neighbors reported that Davis and Mrs. Duncan had ". . . packed suitcases and appeared to have left town." Wagner found Davis, Mrs. Duncan and the children at Davis' place of employment. Mrs. Duncan was shaking badly and appeared "to be out of touch with reality." Davis was "completely drunk, absolutely drunk." Davis swayed when he stood and staggered when he walked. He almost touched the floor with his hands when he swayed. At one point he tried to walk through a door, backed up, and said "excuse me" to the door.

Wagner last saw Mrs. Duncan on December 23, 1976, on Highway 183 at North Lamar, hitchhiking. She was shaking badly, much in the same manner as when he had seen her on November 24, 1976.

Appellants called Beckie Baker, the Travis County caseworker on the Davis case.

Baker reported that Mrs. Duncan had been attending treatment at Mental Health Mental Retardation Center "fairly regularly," though on several occasions she had missed her appointments and had forgotten to take her medication. Davis and Mrs. Duncan have cooperated with the welfare office. Mrs. Duncan had participated in "parenting" classes. They have visited the children and have brought small gifts. Baker was of the opinion that after having taken advantage of community services, Davis and Mrs. Duncan have not made any significant change in their ability to take care of the children. Baker testified that when she picked up the children from home visits with Davis and Mrs. Duncan, the children were worried and in "very poor emotional condition."

Davis described his relationship with Mrs. Duncan as living "as a commonlaw with my wife." He loves the children. He never punished the children except with a small switch. Mrs. Duncan never punished the children. He explained the bruises on Kellie by the fact that Kellie plays "very roughly." He denied that he or Mrs. Duncan burned Kellie. Davis testified that he knows that he is an alcoholic. He goes to Alcoholics Anonymous and has now joined a church. He prays regularly. His religion helps him to control his drinking. He is "determined to never drink again." On cross-examination, Davis admitted that since the children had been taken by appellee, he had been hospitalized twice for alcoholism. Davis claimed, by way of excuse, that appellee's taking the children had caused him to turn once again to drink.

Appellants placed into evidence psychiatric testimony which tended to show that schizophrenia can be controlled by proper medication, that Mrs. Duncan can probably provide care for the children, and that housekeeping habits do not have much effect on emotional behavior of children.

In a nonjury case the trial court is the judge of the credibility of the witnesses and the weight to be accorded their testimony. *Harrell v. Sunylan Co.*, 128 Tex. 460, 97 S.W.2d 686 (1936); *White v. Chamberlain,*

525 S.W.2d 273 (Tex.Civ.App.1975, no writ). Likewise, wherein there is conflicting expert testimony, the court in a nonjury case is free to adopt part or all of the expert's valuation or theory and reject the other expert testimony. *Hood v. Texas Indemnity Insurance Co.,* 146 Tex. 522, 209 S.W.2d 345 (1948).

■ The children's health and nourishment were woefully neglected. The court could have concluded that Kellie had been physically abused and mistreated. The court could have concluded that Mrs. Duncan, because she is unable to care for herself, is certainly in no position to take care of the children. As a result, during the days and weeks that Davis is incapacitated by drink, the children, age four and two, must fend for themselves. The district court was in a position to measure the future conduct of Mrs. Duncan and Davis by their recent past conduct as it might be related to the same or similar situation. *De Llano v. Moran,* 160 Tex. 490, 333 S.W.2d 359 (1960), *D___ F___ v. State,* 525 S.W.2d 933 (Tex.Civ.App.1975, no writ). The district court was not required to believe that there has been a lasting change in Davis' attitude and behavior toward alcohol since appellee took the children. The fact that Davis has been twice hospitalized for alcoholism since that time argues against Davis' professed turnabout in behavior. Neither was the court required to believe that Mrs. Duncan had undergone a change that would empower her to control her mental illness by medication to the extent necessary to care for the children. Appellants' own witness, Baker, testified that Davis and Mrs. Duncan, after having availed themselves of all "community services," had not made any significant change in their ability to take care of the children.

The judgment is supported by the evidence and, further, is not contrary to the great weight and preponderance of the evidence. Accordingly, appellants' sixty-six points of error are overruled.

The judgment is affirmed.

Affirmed.