# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00653-CV

**Pedro Castorena and Penny Renee Delgado, Appellants**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

**FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT**
**NO. 2001-0993, HONORABLE DON B. MORGAN, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

After a bench trial, the court found by clear and convincing evidence that the parental

rights of Pedro Castorena (Castorena) and Penny Renee Delgado (Delgado) should be terminated.

In two issues on appeal, each contends that the evidence was factually insufficient to support the

grounds for termination and to support a finding that the termination was in the children's best

interest.[1]

### Background

Delgado is the mother of the four children involved in this termination suit. M.D.,

the oldest, was born in February 1994. M.D.'s father is Miguel Delgado, Penny Delgado's second

---

[1] Although Castorena and Delgado were represented by separate counsel at trial and on appeal, much of the evidence overlaps and their appellate challenges are essentially the same.

husband, to whom she was still legally married at the time of trial. F.H., whose father is Jose Hernandez, was born in June 1997.[2] M.D.C. was born in March 1999, E.D.C. in June 2000. Castorena is the father of the two youngest children.

### *History of Involvement with CPS*[3]

The referral that ultimately resulted in the filing of these termination proceedings occurred in July 2001. Julie Melton, the CPS investigator handling the referral, discovered that CPS had conducted investigations into this family dating back to December 1995 for physical and medical neglect, physical abuse, and neglectful supervision.[4] Although services were offered on more than one occasion, no previous referral resulted in the children being removed from the home. The December 1995 referral alleged, among other things, that Delgado's boyfriend locked her out in the cold, along with her baby clothed only in a diaper; maggots were found in the sink and in the couch where the baby had been sleeping.

---

[2] Miguel Delgado and Jose Hernandez were represented by counsel at trial. Hernandez had been deported to Guatemala. He had had no contact with F.H. since she was very young. Counsel talked to Miguel Delgado by telephone. He was in the United States illegally and would not disclose his whereabouts to counsel. When counsel called the same number again, she was informed that Miguel Delgado had returned to Mexico. Miguel had made no effort to contact M.D. for years and made no effort to respond to the contact concerning termination. No appeal was perfected on behalf of either Miguel Delgado or Jose Hernandez.

[3] CPS is the Child Protective Services Division of the Texas Department of Family and Protective Services. References in the text will be to CPS or "the Department."

[4] A file of reports on the contacts between the Department and the family was admitted in evidence as a business record as well as the narrative testimony of the various caseworkers who prepared the reports.

In June 1997, Seton Home Health Care became involved with the family because Delgado had alcohol in her system when F.H. was born and admitted a lack of child care knowledge. Delgado also admitted that she was in an abusive relationship with F.H.'s father. She said that on several occasions he had kicked the car seat while F.H. was in the seat. Delgado said that her mother had been married seven times and the different husbands had abused her and her siblings until CPS intervened and pressured the men to move; Delgado said she supposed CPS would have to do the same with her.

In September 1997, a police officer contacted Delgado because three-year-old M.D. was running around the apartment complex, including the pool area, unsupervised. Delgado told the police officer that M.D. was bright and could handle herself. In October 1997, Delgado told a CPS worker that she did not see any danger in letting M.D. play outside at the complex unsupervised. She further told the caseworker that she had been in jail for hitting M.D.'s father with a hammer because she wanted to get back together and he refused.

A July 1999 referral alleges that Delgado reported to law enforcement that Castorena abused M.D. by kicking the child in the back and flicking a beer-bottle cap at her, striking her under the eye. In January 2000, Delgado was investigated for leaving six-year-old M.D. to care for the younger children. She admitted to a pattern of leaving the children alone for as long as an hour while she went to the store with Castorena. M.D. was not in school because she did not have immunizations. In February 2000, Delgado told the caseworker that Castorena regularly beat her and hit the children. Sometimes he withheld food. At that point, the Department started family-based safety services. The case worker noted poor bonding and attachment between Delgado and the

3

children; lack of supervision and chronic neglect; dirty children with chronic lice; medical treatment was not sought for the children and Delgado did not obtain prenatal care, although she was approximately six months pregnant. Castorena apparently never sought medical care on her behalf. There was a history of domestic violence between Delgado and Castorena, which Delgado minimized as "arguing." At a March 2000 visit, there was no food in the house. A woman's shelter provided a bus ticket to Georgia so Delgado and the children could stay with some of Delgado's relatives.

When Delgado relocated to Georgia, the Department had been at the point of removing the children because of Castorena's presence. She returned to Texas in April of 2000 and moved into a mobile home in Kyle. The Department understood that Castorena would not live there but he moved in within three days. Services started again in August 2000.

### Referral Leading to Removal

In July 2001, CPS picked up the children based on a referral alleging that Delgado abandoned the children. Delgado left the children at Maria Rodriguez' house. Delgado told Rodriguez that she was going to go fill out some job applications. Rodriguez thought Delgado would be gone for a couple of hours, but after three days she had not returned. Not knowing how to contact Delgado, Rodriguez called the police, who took the children to their maternal grandmother for only one day, after which CPS picked them up. Melton said that the children stated that before being left with Rodriguez, they had been sleeping in the car at rest stops. The children did not know where their mother was.

4

The children were picked up on July 12; Delgado contacted Melton on July 16. She said that Castorena had evicted them from the mobile home in Kyle in May. Even before evicting them, Castorena had the electricity turned off. The children lived there for about a month longer. After being evicted they had been sleeping at rest stops, as well as staying with friends and with persons contacted through Delgado's church. She was not working, but her pastor had been helping with some money and supplies. Delgado claimed that Rodriguez had agreed to care for the children for four or five months while Delgado looked for work.

F.H. told the children's guardian ad litem, Jill McLaughlin, that the children slept on the road, not in the car. There were maggots in the car. McLaughlin testified that she feels that Delgado takes very little responsibility for anything. Based on her conversation with Rodriguez, she thought the children had been abandoned. McLaughlin did not believe Delgado was simply looking for a job.

Ms. McLaughlin testified that the Department made extensive efforts to find a relative with whom the children could be placed. For a variety of reasons, none of Delgado's relatives could keep them. Castorena could not provide a name of any of his relatives who were in the country legally. However, Delgado said that she took the children to Castorena's mother, who refused to help Delgado by keeping the children temporarily because she wanted Castorena to have custody.

### Criminal History and Violence

Delgado admitted that she and Castorena were physically violent to each other. Delgado characterized herself as "more violent than Pedro [Castorena]." In addition to attacking Miguel Delgado with a hammer (with one or more children present) because he would not get back

5

together, she admitted threatening Castorena's sister with a knife and was on probation for a terroristic threat conviction based on this incident. Cheryl Reitz of the Hays County probation office testified that a motion to revoke probation was filed because Delgado failed to obey the court's orders to keep gainful employment, failed to report on one date, failed to pay probation fees one month, and failed to obey the admonishment to have no contact with Castorena. The probation file noted a history of domestic violence between the two.

Castorena had had a misdemeanor assault charge in 1999 and later was on deferred adjudication for another. Castorena told Reitz that he was concerned about his safety, that Delgado was stalking him and causing him to lose jobs. He wanted a protective order against her. Delgado took the children over to a neighbor where Castorena was staying and said that she might have to kill Castorena. Castorena apparently took no steps to protect the children against any possible violence.

*Stability*

David Sweet, pastor of the Hays Hills Baptist Church, testified that he tried to help Delgado with several crises in her life over a several-month period in 2000. He found places for the children to stay when Delgado spent time in jail. Sweet testified that he began to see that Delgado cared for the children, but she did not have the desire or maturity to do what it took to protect them. He was concerned that she had no safety net; her parents would not take the kids because of where they were living. He could not believe that Castorena did not care for her and give her any support. In several homes in which she stayed in the summer of 2000, Delgado was asked to leave after a short stay because of her irresponsibility and personality conflicts. Sweet was particularly concerned about one place she stayed because of a large number of single adult males living there.

6

He testified that the church gave her a car seat, but she did not make any effort to buckle it in the car, so the car seat was freestanding. At the time, Delgado and the children were living in the car. The people with whom she stayed in three different homes said that Delgado would party at night, would go out and leave the kids, forcing M.D. to change diapers and otherwise be the responsible party. Sweet said that Delgado relied on M.D. to take care of the baby more than he thought appropriate. The baby was not changed very often; the other children were often dirty. He ultimately concluded that Delgado did not have the maturity or stability to keep the children and take care of them. "She loved the kids like a ten year old would love them." Delgado called him and asked him to pray because she was trying to get the kids back; he told her he could not do so. "I prayed for her to lose the kids because I finally realized that nothing was going to change."

Pamela Bloss testified that Delgado and the children stayed with her for about a month in the fall of 2000. When the children arrived, they had a lot of infected sores and "were overriden with lice." They barely knew what many different kinds of food were. She said there was at least one time when Delgado was gone all night. She was convinced that Delgado was not capable of taking care of the children; Delgado did not interact with the children as a mother. After a while, Bloss said that she "just wanted her to go somewhere else. I just couldn't take the fact of all the children and being left in [my] care all the time because I also had my own children to care for."

*Therapist's Concerns*

Richard Sears, the therapist for the two oldest children, began seeing M.D. in October 2001. He testified that M.D. had difficulties in socialization, night terrors, bedwetting, and difficulties with reading and language. M.D. had difficulties understanding safe relationships with

adults, as she would approach any adult, even a stranger, seeking affection or attention. She would wake up screaming and crying, thinking she was seeing the devil or demons. Castorena told her the devils were watching her. M.D. told him about being hit with beer bottles that Castorena threw when he was angry at her. There was a lot of anger and arguing in the home. Sears diagnosed her as being depressed and having post-traumatic stress disorder, in part because no adults in her life protected her. M.D. spent a lot of her time trying to protect the younger siblings. M.D. discontinued her visits with her mother about two or three months before trial because sometimes her mother would be upset with her and not play with her and M.D. did not know why. M.D. also said that she fears Castorena; she described incidents when she and the other children and Delgado would have to hide from Castorena.

F.H. began therapy in January 2002. She really did not want to talk much about her life with Delgado and Castorena. She reported that Castorena had grabbed her arm and thrown a beer bottle at her.

### Events Between Removal and Trial

According to McLaughlin, the visits between Delgado and the children were unpredictable. Lorrie Browning, a CPS caseworker, said that Delgado would often spend thirty minutes staring at the ground and not interacting with the children if she felt confronted by the caseworker before the visit. In recent visits, Delgado interacted more with the children. At the time of trial, M.D. had chosen not to visit with her mother because she was not comfortable anymore. Delgado attended only one permanency planning meeting out of three or four, although she did

attend counseling. Browning testified that Delgado took a parenting class, but one that was shorter than the approved class. Browning did not have Delgado's current address.

From July until December Castorena did not visit. In December, Castorena and Delgado reunited. He started coming with Delgado, but missed several visits before trial. His visits went fairly well and he actively played with the children. However, the children did not speak Spanish and he insisted on speaking only Spanish which puzzled them.

In January 2002, Delgado moved to North Texas. In April 2002, she obtained employment with Hudson Industries and received a favorable report after four months of work. Delgado said that she and Castorena had purchased a mobile home in Cooke County. However, it appears to be a contract for deed purchase because the "previous" owner is still the owner of record; it is uncertain whether Delgado will own an interest such that she cannot be "evicted" again. In any event, McLaughlin testified that the mobile home, which has no water service or septic system, would be not be suitable for the girls. In August 2002, the mobile home was "red-tagged" as uninhabitable because of the lack of a septic system. Nevertheless, Delgado continued to live there and intended to bring the children to live there.

### Termination Recommendation/Placement Plan

Lori Browning, a CPS caseworker involved with this family, recommended that all parental rights be terminated based on the lack of provision of any kind of stability or nurturing. In her opinion, all of the children were at great risk of further abuse and neglect. Delgado was emotionally unstable and prone to making choices that were not in the children's best interest. Against the advice of two therapists, she remained with Castorena in a volatile and violent

9

relationship. Browning said that the Department had been leaning toward termination in September 2001 because of a lack of progress; Delgado took no initiative to make changes. She testified that Delgado had placed the children in dangerous circumstances, such as repeatedly leaving the children in various places without an appropriate caregiver.

Browning opined that Castorena also knowingly placed the children in dangerous conditions by actions such as cutting off electricity in the mobile home in Kyle when they were still living there, throwing them out of the home when they had no place to go, allowing them to live in a car, failing to provide any support, and being willing for them to move to another inappropriate situation, a mobile home without a septic tank. She said the placement with the foster family was very healthy; the children have progressed developmentally, emotionally, and physically. Browning testified that it is in the children's best interest that Delgado's and Castorena's parental rights be terminated.

McLaughlin, guardian ad litem, testified that the foster placement is working well. These foster parents are interested in adopting all four children. M.D. is now doing well in school and continues therapy. McLaughlin testified that she believed that the last year [in foster care] is the first time that the girls have spent one year in one place. She also expressed concern about the lack of education that the children received when living with Delgado and Castorena, particularly M.D.'s multiple and lengthy absences from school.

The therapist, Sears, testified that M.D. wants to stay with her foster parents. She likes having her sisters there and she likes her school. He said the improvements she has made have come from the stability and structure provided in the last year. Her language has improved and is

10

now up to grade level. He is concerned about any change in the stability level of the children's environment. He said that it was in the children's best interest for Delgado's and Castorena's rights to be terminated.

*Parents' Testimony*

Castorena acknowledged kicking Delgado and the girls out of the mobile home in Kyle because he was angry. He said that he made a mistake. He acknowledged that he did not give Delgado any financial assistance because he was upset. He said he loved all the children. However, when asked, "Then why did you allow your children to live on the streets?" he answered, "Because of that mistake that I made, just for that." He said he later tried to find the children. One of his brothers told him that the Department had removed the children from Delgado.

Castorena described the purchase of the mobile home. He purchased it from someone from whom his brothers had made purchases; the home's owner was to keep track of the payments "in a small piece of paper." He said that the mobile home would be Delgado's. He described building onto the mobile home to make it bigger and give the girls their own bedrooms. He said that he had permission from his brother to hook into the septic system on his brother's adjoining property; "[it] doesn't take that much to put tubing from her trailer to the septic tank." Castorena described the property as pleasant, close to a church and school. He said his brothers and their families would help with child care while Delgado was at work. He said that he would support Delgado and the children if his rights were not terminated.

He discussed having completed an anger management class, but also denied being a violent person. He denied ever throwing a beer bottle at any of the children. He received

11

counseling, which helped at first, but when Delgado started receiving counseling, then it did not help and caused more clashes between the two. He thought she was generally a good mother. He also said that he thought she was receiving some services "that she should not have been receiving. They made a mistake in providing those services to her." He thought those services were hurting her rather than helping her. When later asked what he meant, he said that he thought they put too much pressure on her and that stress caused a miscarriage. However, the date of this event and connection between it and any services provided was vague.

Delgado testified concerning her living situation at the time of trial. She discussed her job, getting a good review, and the mobile home and the improvements they were working on. She said she traveled from north Texas to San Marcos to visit the children. She said she wanted to be independent of Castorena, which in part would involve her trying to get a GED. She claimed that Maria Rodriguez knew Delgado's mother's phone number and had agreed to keep the children "until I got on my feet." She denied that Castorena had ever hit M.D. with a beer bottle or been violent. She admitted having had an earlier period of fighting with Castorena and going to a women's shelter; she was nine months pregnant and gave birth at the shelter. She discussed having taken a parenting class and said that she had learned how to be more patient with the children.

**Termination**

The natural right existing between parents and their children is of constitutional dimensions. *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994); *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *Wiley v. Spratlan*, 543 S.W.2d 349 (Tex. 1976). A parent's relationship with his child is a fundamental liberty interest protected by the Fourteenth Amendment. *Santosky v. Kramer*, 455

U.S. 745, 753 (1982); *Lassiter v. Department of Soc. Servs. of Durham City*, 452 U.S. 18, 27 (1981); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1966).  The integrity of the family unit has found protection in the Due Process and Equal Protection Clauses.  *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Termination of the parent-child relationship is final and irrevocable and divests for all time the parent and child of all legal rights, privileges, duties and powers with respect to each other except for the child's right to inherit.  *Holick v. Smith*, 658 S.W.2d 18, 20 (Tex. 1985).  However, although parental rights are of constitutional magnitude, they are not absolute.  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *Id*.

Because termination of parental rights is such a drastic remedy and is of such weight and gravity, due process requires the petitioner to justify termination by the heightened burden of proof of "clear and convincing evidence."  Tex. Fam. Code Ann. § 161.001 (West 2002); *In re G.M.*, 596 S.W.2d at 847.  The Department must prove by clear and convincing evidence that (i) a parent committed one of the acts or omissions set out in § 161.001(1) and (ii) that the termination of parental rights is in the child's best interest.  Tex. Fam. Code Ann. § 161.001; *In re G.M.*, 596 S.W.2d at 847.  "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2002); *In re C.H.*, 89 S.W.3d 17, 19-25 (Tex. 2002); *In re G.M.*, 596 S.W.2d at 847.  This standard is an intermediate standard, falling

between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  *See In re G.M.*, 596 S.W.2d at 847.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations.  *In re C.H.*, 89 S.W.3d at 25.  In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings.  *Id*. at 27-29.  Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.  *Id*.  An appellate court should specify its reasons for concluding that a reasonable trier of fact could not have attributed disputed evidence in favor of the finding.  This standard retains the deference an appellate court must have for the fact finder's role.  *In re C.H.*, 89 S.W.3d at 26.

*Termination Grounds*

"Endanger" means "to expose to loss or injury; to jeopardize."  *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).  Endangerment of a child does not have to be established as an independent proposition, but can be inferred from parental misconduct alone.  *Boyd v. Texas Dep't of Human Servs.*, 727 S.W.2d 531, 533 (Tex. 1987).  It is not necessary that the conduct be directed at the child or that the child actually suffers physical or emotional injury.  *Id.; In re B.B.*, 971 S.W.2d

14

160, 169 (Tex. App.—Beaumont 1998, pet. denied).[5]  The conduct does not have to constitute a concrete threat of injury to the child.  *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied).  The conduct does not have to occur in the presence of the child; it may include conduct before the child's birth and both before and after the child has been removed by the Department.  *In re B.B.*, 971 S.W.2d at 166-69.  "Conduct" includes not only acts but omissions.  *In re M.J.M.L.*, 31 S.W.3d at 351; *In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [1st Dist.] 1989, no pet.).

Under section 161.001(1)(E), the focus is on the parent's conduct; one specifically looks to the parent's omissions and acts.  *In re P.S.*, 766 S.W.2d at 833, 835 (Tex. App.—Houston [1st Dist.] 1989, no writ).  If the parent displays a voluntary, deliberate, and conscious course of criminal conduct, it qualifies as conduct that endangers the emotional well-being of the child.  *In re J.N.R.*, 982 S.W.2d 137, 142 (Tex. App.—Houston [1st Dist.] 1998, no pet.).  A showing of a causal connection between the parent's conduct and any resultant injury or adverse effect to the child is not required.  *Boyd*, 727 S.W.2d at 533; *In re M.J.M.L.*, 31 S.W.3d at 353; *In re W.A.B.*, 979 S.W.2d 804, 808 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

Under section 161.001(1)(D), the focus is on the "conditions or surroundings" that endangered the child's physical or emotional well-being."  *In re P.S.*, 766 S.W.2d at 835.

---

[5]  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002), disapproved of the articulation of the standard of review in a number of cases, including *In re B.B.*; *In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [1st Dist.] 1989, no pet.) (cited p. 15); *In re J.N.R.*, 982 S.W.2d 137, 142 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (cited p. 15); *In re D.L.N.*, 958 S.W.2d 934 (Tex. App.—Waco 1997, pet. denied) (cited p. 20).  None of the propositions for which these cases are cited is affect by *C.H.*

Inappropriate, abusive, or unlawful conduct by persons who live in the home of the child or with whom the child is compelled to associate on a regular basis in his home inherently is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1992, writ denied); *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of living conditions, but also to the parent's conduct in the home). Section D permits termination because of a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied). Neglect "can be as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d at 270. Evidence that a child's medical needs have been neglected will support a finding under section 161.001(1)(D). *See In re A.P.*, 42 S.W.3d 248, 257 (Tex. App.—Waco 2001, no pet.); *In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.). Evidence that a parent has neglected the child's physical needs will also support a finding under section 161.001(1)(D). *In re M.C.*, 917 S.W.2d at 270. Evidence that a parent has jeopardized the children's well-being by allowing them to live in unsafe or unsanitary conditions will support a finding under 161.001(1)(D). *In re M.C.*, 917 S.W.2d at 270.

Appellant Delgado argues that the termination was simply a "social engineering project" based on the Department's decision that Delgado and Castorena should not live together. After finding the placement with the foster parents proved satisfactory, termination was simply based on a decision as to the children's best interest. Delgado argues that there is no basis for termination under sections 161.001 (D) and (E) because the Department was relying entirely on a "few periods of homelessness" and financial hardship. Appellant Castorena argues that the Department's only

16

basis for termination was the eviction at a time when they had no place to go. Castorena argues that the Department produced no evidence concerning his knowledge. Both appellants, however, minimize the totality of the evidence and the permissible inferences therefrom.

In this case, both Delgado and Castorena engaged in violent criminal conduct. Delgado admitted to hitting Miguel Delgado with a hammer. She was convicted of terroristic threat as a result of threatening Castorena's sister with a knife. Her probation was almost revoked, in part because of threatening behavior toward Castorena. In the children's presence, she threatened to kill Castorena. Castorena had assault charges brought against him. Although their violent conduct did not always result in criminal charges, their pattern of behavior is similar to a deliberate course of criminal conduct that endangers a child's emotional well being. *See In re J.N.R.*, 982 S.W.2d at 143.

Both Delgado and Castorena attempted to minimize the level of violence in their household. However, the trial court was not required to believe Delgado's recantation of her reports to the Department concerning abuse by Castorena toward her and the children. Nor was he required to disbelieve M.D.'s and F.H.'s description of violence and of being afraid of Castorena. The fact finder could take note that, although Castorena was taking an anger management class and admitted kicking the children out of the mobile home because he was mad, he nevertheless denied being a violent person. Nor was the court required to believe that Delgado and Castorena would be able to transform their relationship into one of being friends and working together for the children in view of their long history of volatility. The fact finder could consider the couple's long history with the Department as offsetting their short-term partial compliance.

17

The Department had received multiple referrals on the family for various forms of neglect. As detailed in the statement of facts, the children were often unsupervised or left with only the six-year-old to take care of them. Their medical needs were neglected. They spent time living in a mobile home without electricity, only to be kicked out and relegated to living in a car. Their surroundings were often unsanitary. Four young girls were left in a house with nine unrelated adult males, not always the safest of environments. Some referrals resulted in a finding of "reason to believe," others were eventually dismissed. That each and every referral did not result in removal does not diminish the overall pattern, particularly in view of the fact that the numerous referrals occurred over a long time period and came from many different sources. The court also had before it the testimony of several persons not affiliated with the Department who had observed the children. The court was not bound to accept the parents' assertions as to their future good intentions.

The trial court had before it evidence from which it could reasonably form a firm belief that the allegations were true. Accordingly, we overrule Delgado's and Castorena's issues.

**Best Interest**

There are nine non-exhaustive factors that a court may consider in determining whether a termination is in a child's best interest. *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). The factors include: desires of the child; emotional and physical needs of the child now and in the future; emotional and physical danger to the child now and in the future; parenting abilities of the parties seeking custody; programs available to assist these persons; plans for the children by parties seeking custody; stability of the home or proposed placement; acts of omissions committed by the

18

parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions committed by the parent. *Id*. at 372.

A party seeking an involuntary termination of parental rights is not required to prove all nine *Holley* factors as a "condition precedent" to termination. *In re C.H.*, 89 S.W.3d at 27. The absence of evidence regarding some of the factors does not preclude the fact finder from reasonably forming a strong belief or conviction that termination is in a child's best interest, particularly if there is undisputed evidence that the parental relationship endangered the safety of the child. *Id*. While no single consideration is controlling, the analysis of evidence relating to one factor may be adequate in a particular factual setting to support a finding that termination is in the best interest of the child. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). A best-interest analysis may be based not only on direct evidence but also on circumstantial evidence, subjective factors, and the totality of the evidence as a whole. *See In re S.H.A.*, 728 S.W.2d 73, 86 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

For the same reasons urged in their first issue, Delgado and Castorena contend that the evidence is factually insufficient to support the trial court's finding that termination was in the children's best interest.

***Emotional and Physical Needs of the Children; Danger to the Children; Parental Abilities***

The need for permanence is a paramount consideration for a child's present and future emotional needs. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.); *Salas v. Texas Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 792 (Tex. App.—El Paso 2002, no pet.). Children

19

require secure, stable, long-term, continuous relationships with their parents or foster parents. *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513 (1982). A fact finder may consider the consequences of its failure to terminate parental rights. *D.O. v. Texas Dep't of Human Servs,*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ).

A fact finder may measure a parent's future conduct by her past conduct and determine that it is a child's best interest to terminate her parental rights. *See Davis v. Travis County Child Welfare Unit*, 564 S.W.2d 415, 421 (Tex. Civ. App.—Austin 1978, no writ). Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, the fact finder may permissibly infer that an adult's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation. *May v. May*, 829 S.W.2d 373, 376-77 (Tex. App.—Corpus Christi 1992, writ denied); *see also Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."). Further, a fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re D.L.N.*, 958 S.W.2d 934, 934 (Tex. App.—Waco 1997, pet. denied). A fact finder may also infer that a parent's past inability to meet a child's physical and emotional needs may indicate the parent's future inability to meet those needs if the child is returned to the parent. *In re D.O.*, 851 S.W.2d at 356.

The trial court properly could infer that Delgado's and Castorena's history of instability and criminal conduct, all of which endangered the four children, might recur in the future if the children were returned to them. *See D.L.N.*, 958 S.W.2d 934; *see also M.J.M.L.*, 31 S.W.2d 351; *Ray*, 832 S.W.2d at 435; *May*, 829 S.W.2d at 376-77; *Davis*, 564 S.W.2d at 421. The trial court

20

could also infer that Delgado's past inability or unwillingness to care for her four children is indicative of the quality of care that Delgado is capable of providing for any of the children in the future. The same analysis applies to Castorena; he actively interfered with the child's care by cutting off their electricity and rendering them homeless; he also failed to help Delgado obtain pre-natal care and was responsible for creating a situation in which Delgado gave birth once while in a shelter. *See D.O.*, 851 S.W.2d at 356; *see also M.J.M.L.*, 31 S.W.2d at 351; *Ray*, 832 S.W.2d at 435; *May*, 829 S.W.2d at 376-77; *Davis*, 564 S.W.2d at 421.

The trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions. *D.F. v. State*, 525 S.W.2d 933, 939-40 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Delgado testified that she has done everything she needed to do to provide a safe environment for the children, yet she was still dependent on Castorena for a place to live. Castorena cut off the electricity in the mobile home in which she and the children were living and then evicted the family, including his two infant children, leaving her to live on the street without food or money. The mobile home in which Delgado was living and planned to live with the children was condemned for lack of a septic system. Delgado admitted that her living conditions, subjecting the children to repeated abusive behavior, and moving frequently, all had a bad effect on the children. At times, Delgado was less than candid with the court concerning her contacts with the Department. The court was not bound to believe that she and Castorena had turned their lives around.

It is not in a child's best interest that he be made a guinea pig "upon whom [her] parents should be allowed to practice until they might become more proficient in child care. *See In*

21

*re Sneed*, 592 S.W.2d 430, 432 (Tex. Civ. App.—Fort Worth 1979, no writ). In reviewing the parental abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of other children not the subject of the termination suit. *In re D.O.*, 851 S.W.2d at 356.

Delgado has not shown an ability to be a parent to any of her four children. Sweet, her pastor, who had a chance to observe her parenting and interaction with the children, testified that she did not have the maturity or ability to take care of the children; she loved them like a ten-year-old would love them. He said that he prayed that she would lose the children. Several individuals with whom she stayed testified about Delgado's propensity to leave the children with the six-year-old while she went out. The guardian ad litem testified that it was in the children's best interest to terminate Delgado's and Castorena's parental rights.

*Programs Available; Plans for the Future*

A fact finder can compare the contrasting plans for a child by the parent and the Department. *See In re D.O.*, 851 S.W.2d at 356. A fact finder can consider whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* In comparing the Department's future plans for the children and Delgado's and Castorena's future plans, the trial court properly could have concluded that the Department's plan for the children's future was more realistic. The Department's plan is to have the current foster family adopt the four children. The foster parents have provided a stable environment; the children who are old enough attend school and are doing much better in school. By comparison, the fact finder could have concluded that Delgado and Castornena's plans were vague; that planning on housing the children in a condemned mobile home

22

were harmful; and, based on the totality of the circumstances, that Castorena's assertions concerning help from his family were not reliable.

The trial court have before it clear and convincing evidence that termination was in the best interest of the children. We overrule Delgado's and Castorena's second issues.

## Conclusion

We hold that clear and convincing evidence supports the trial court's findings as to the grounds for termination and the best interest of the children. We have overruled all of the issues presented and affirm the judgment of the trial court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   April 29, 2004