COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| D.G., | | No. 08-13-00261-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 65th District Court |
| | § | |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § | of El Paso County, Texas |
| | | (TC # 2011DCM10425) |
| Appellee. | § | |

# **O P I N I O N**

We address once again the termination of a mother's parental rights, a mother who is herself a victim of repeated family violence but, for whatever reason, has refused to protect her child. The facts are eerily reminiscent of our recent decision in *C.B. v. Department of Family and Protective Service*, --- S.W.3d ---, No. 0-11-00286-CV, 2013 WL 3064405 (Tex.App.-- El Paso June 19, 2013, no pet.). For the reasons that follow, we affirm.

## FACTUAL SUMMARY

The case was tried to the bench on June 18 and August 13, 2013. D.G. has five children and at the time of trial, she did not have custody of any of them. By her first husband, M.C., she has a son M.C. and a daughter I.C. These children live with their father and stepmother. D.G. has one son H.C. and one daughter S.C. by her second husband, V.C. These children are living with their paternal grandmother. At issue here is a four-year-old little girl, whose initials are also

1

D.G. For clarity, we will refer to her by the pseudonym "Dawn" as referenced in briefing. We will refer to D.G. as Mother.

Dawn's father is G.G. and we will refer to him as such.[1] Mother testified that she and Father had been living together for seven years. It is unclear whether Mother and Father are married. The record contains references to a common-law marriage and purported agreements for marriage counseling. Yet it also references a suit to adjudicate parentage in which G.G., as an alleged father, judicially admitted that he is Dawn's father. Moreover, the trial court heard testimony that while this case was pending, Mother told the caseworker that she was "engaged" to a man named "Steve". Father knew about Steve, and admittedly assaulted him, but claimed ignorance as to any engagement. To complicate matters further, progress reports from Mother's counseling sessions mention a miscarriage in December 2012. Parentage of that child has never been mentioned.

The Department had initial contact with Mother in 2006 when her son M.C. suffered a broken arm. Hospital personnel discovered a previous ankle fracture that also required casting. At this time, Mother was married to and living with V.C. She was referred to Family Based Safety Services and completed counseling, individual and family therapy, and parenting classes.

The second intake occurred in 2011 with regard to physical abuse by Father toward H.C. Mother and Father were referred to Family Based Safety Services. A service plan was formulated in September 2011, requiring that Mother attend domestic violence classes, individual and family therapy, parenting classes, and that she meet the children's medical and educational needs. There was also a requirement that she protect her children by not allowing Father into the home. The evidence varies, but even Mother admitted that he had come into the

---

[1] Midway through trial, Father executed a voluntary relinquishment and his parental rights were terminated on that basis. *See* TEX.FAM.CODE ANN. § 161.001(1)(K)(West 2008). He is not a party to this appeal.

home at least once when he brought the children food from McDonald's. I.C. said that on another occasion, Father broke in and hit her brothers. Mother maintained that he tried to break in through the window, but the window was locked.

Mother proclaimed that neither she nor Father had ever hit the children, but during the Department's investigation, the children spoke about recurrent family violence. I.C. reported that her mother pulled her hair. M.C. spoke of Father hitting him. S.C. was afraid of Father because "he hits Mommy." H.C. was afraid of Father because Father hit him. In October 2011, an additional incident was reported in which S.C. complained that her mother kicked her in the stomach and pulled her hair. Father had kicked her in the "butt". H.C. recounted that his mother hit him in the shower, slapped him, and pushed his head against the wall. Mother denied all of these accounts, complaining that I.C. and M.C. were told what to say by their father and grandmother and that H.C. had been injured at school. S.C. and H.C. recounted that Father had put their hands over a hot stove because they had burned a pizza box. Mother explained that he only turned on the stove to demonstrate how hot it was and how easily they could be burned. At this point, S.C. and H.C. were placed with their paternal grandmother. After M.C. and I.C. told representatives of the Department that they were disciplined with the cord of an iron, these two siblings were placed with their father. And by November 2011, Dawn was placed first with Father's aunt and then with his mother and stepfather. In February 2012, Mother signed the paperwork for the four older children to be placed in the managing conservatorship of the relatives named above. Mother retained possessory conservatorship. At that time, the Department moved forward with a Chapter 264 case whereby additional services were offered. At trial, Mother testified that she had not seen M.C. or I.C. because they had moved away from El Paso. She had experienced difficulty in visiting with S.C. and H.C. because of the

3

grandmother's interference. Mother's visitation with Dawn was supervised and usually arranged at a local McDonald's.

Ana Marquez was the Department case worker assigned to Dawn. As the child became more verbal, she related that "Dada hit Momma." Father was not visiting with her. Marquez supervised approximately 40% of the visits between Mother and daughter. Mother spent her time texting on her telephone while Dawn played by herself. On one occasion, Mother called Father so that the child could talk to him. There were several occasions when Mother did not attend her visitations and Martinez explained that the June 2013 progress report indicated Mother missed scheduled visits on April 11, April 23, May 2, May7, May 9, May 30, and June 20. Marquez admitted that Mother usually called to notify the Department that she would not be coming. But the week before trial she claimed to be having surgery, although the designated hospital advised that there was no patient by that name. Marquez testified that for Dawn, the goal is adoption and that her grandmother and step-grandfather wish to adopt the child.

Marquez also testified that Mother continued to maintain a relationship with Father. Father admitted it to Marquez on many occasions, although Mother denied it. Representatives of the Department had seen them together. Father had been spotted at the McDonalds where the visitations occurred, and he had been seen dropping Mother off for the visitations. Shortly before trial began in June 2013, he was at Mother's apartment when an assistant case worker stopped in. Father introduced himself as someone else, but he later admitted to Marquez, "I know you know it was me. I know you know it was me, Ana. I was there." Thus, despite the fact that Mother had (1) obtained employment, (2) obtained housing, (3) finished parenting classes, and (4) completed all of her service requirements, the biggest concern for the Department was the ongoing relationship with Father, and Mother's inability to learn from her mistakes. For

4

example, Marquez described that the purpose of the individual therapy was to help Mother build independence so she could extract herself from the relationship with Father. She was working on coping skills, dealing with Father's constant harassment, and issues of self-esteem. Yet, Father had arranged for the housing, signed the lease, had been paying the rent, and at the very least was visiting the apartment right before trial.

The trial court granted termination and Mother appeals, challenging the sufficiency of the evidence to support the statutory grounds for termination and the trial court's finding that termination was in the child's best interest.

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2008). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S.,*

5

*and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003)(noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)(in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex. 2002)("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

## Burden of Proof

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20-21. *See In re M.S.,* 115 S.W.3d at 547 and *In the Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.) (cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex. 2003)(noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing

6

evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007)(contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D. and K.D.,* No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied)(op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570.

### Standards of Review

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any

7

evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

The factual sufficiency standards of review are explained in *In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002) and *In re C.H.,* 89 S.W.3d 17 (Tex. 2002). Through them, and when addressing a factual sufficiency complaint, we are told to determine whether, after assessing the entire record, the evidence permits a fact finder to reasonably form a firm belief or conviction about the truth of the State's allegations. *In re J.F.C.,* 96 S.W.3d at 266; *In re C.H,* 89 S.W.3d at 25. Unlike the situation where the legal sufficiency of the evidence is in question, our focus is not simply upon the undisputed evidence that supports the verdict, but the disputed evidence as well. *In re J.F.C.,* 96 S.W.3d at 266. Implicit in the standard is our obligation to accord the fact finder the deference needed for it to fulfill its role. *In re C.H,* 89 S.W.3d at 25-26. Furthermore, if the evidence is factually sufficient, then, it is also legally sufficient. This is so because, logically, there cannot be "no evidence" if the record contains enough evidence to enable the fact finder to reasonably form a firm belief or conviction as to the existence of pivotal facts.

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship.

*Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet. denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Department of Protective & Regulatory Services,* 907 S.W.2d 81, 87 (Tex.App.--Dallas 1995, no pet.).

## SUFFICIENCY OF THE EVIDENCE

### Statutory Predicates for Termination

In Issue One, Mother challenges the sufficiency of the evidence to support the statutory findings regarding termination. The Department alleged, and the trial court found, that Mother had:

- Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

- Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers they physical or emotional well-being of the child; and

- Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

9

*See* TEX.FAM.CODE ANN § 161.001(1)(D)(E) and (O)(West 2008).

## The Recurrent Violence

Mother testified that her first husband had physically and verbally abused her before their children were born. After that, she experienced only verbal abuse. Her second husband was physically and verbally abusive to her, but never in front of the children. The record contains police reports of domestic violence that Mother filed against other men she has dated. She has lived with Father for seven years. She denied that he has ever hit, slapped, pushed, punched or threatened the children. They had agreed that discipline would be limited to "time outs" and taking away the Play Station. Despite her rosy view of life with Father, multiple documents were introduced into evidence, including forms she filled out at the Center Against Family Violence and police reports. The forms reported physical abuse, verbal abuse, and sexual abuse. Boxes were checked indicating she had been pushed, shoved, bumped, slapped, choked, strangled, restrained, kicked and grabbed. There were attempts to run over her with a car and attempts to suffocate her. She had been confined against her will. Property was damaged or destroyed. She described her husband as yelling, raising his voice, screaming, insulting her, humiliating her, degrading her, calling her names, and threatening to take away the children. This violence was conducted in the children's presence. Mother also reported that Father read her email, listened to her telephone messages, called to check up on her, did not allow her to go to school or work, and was jealous of family, friends and strangers. He accused her of flirting and infidelity. He discouraged friendships, questioned her activities and whereabouts, discounted her accomplishments, controlled her access to money, and threatened her with harm or death. He prevented her from using birth control and pressured her to become pregnant. Mother admittedly signed these reports but denied all of it at trial, claiming that the

10

representatives of the Center had filled out the paperwork for her. She had been advised to seek a protective order but opted not do so because of the open CPS investigation. At the time of trial, both Mother and Father were facing multiple charges of injury to a child, although none of these involved Dawn.

Mother was also aware of Father's brushes with the law. He had at least three convictions for possession of marijuana. Indictments were admitted into evidence related to burglary of a habitation and aggravated assault. In June of 2012, assault charges were filed against Father arising from an incident with the purported fiancee "Steve" whom Mother was dating at the time. Two police reports of harassment were filed relating to Father's persistent telephone messages and texts to Steve. Mother filed a police report in August 2012 alleging aggravated assault with a knife. She told the police that Father was very jealous and became upset because he thought she was looking at other men in a bar. There was a scratch on her neck from Father having placed a knife to her throat. Mother chose not to cooperate with the investigation because in her words, "like, we went out and I didn't remember what happened." She later requested that the report not be filed because it was all a "misunderstanding."

Mother also knew that Father had failed to comply with the service plan. He did not comply with the Battering Intervention Program. He was asked to participate in individual or marriage counseling but he did not. He did not complete the Aliviane program. He testified positive for marijuana, but did not comply with recommendations that he attend and complete outpatient therapy.[2] Mother's testimony concluded as follows:

> Q: But throughout this case, you've continued to allow him to take you to visits, continued to allow him to be in the apartment, and continued to have contact with him to the point of even calling him during one of your visits with your daughter,

---

[2] Mother consented to random drug testing. She tested positive once for cocaine, which she claimed resulted from Father kissing her on the lips. The inference, of course, is that Father was using cocaine.

11

even though, from the very beginning of this case, you were asked not to have a relationship with him, correct?

A: Correct.

Q: Even though, from the very beginning of this case, you knew the focus was getting your daughter back to you and complying with what the Department was asking you to do, correct?

A: Right.

Q: Okay. And the Department has repeatedly asked you, throughout this case, whether or not you're still in a relationship with [Father], correct?

A: Correct.

Q: And you've repeatedly told the Department that you are not?

A: Correct.

Q: Even though you're well aware that [Father] continues to tell the Department that you are, correct?

A: Correct.

From this, we conclude that the evidence is both legally and factually sufficient to support termination on all three grounds. Despite her denial, the evidence overwhelmingly indicates that Mother continues to have a relationship with Father. More importantly, she has never said she would leave him in order to regain custody of her child. She has knowingly allowed Dawn to have contact with Father and, as a result, she has placed her daughter with someone who has engaged in conduct which endangers the physical or emotional well-being of the child.

### Best Interest

Also in Issue One, Mother challenges the sufficiency of the evidence to support the trial court's finding that termination was in the child's best interest. Both Marquez and CASA volunteer Eunice Ballesteros testified concerning Dawn's best interests. Dawn is happy with her grandmother and Grandpa "B" and they want to adopt her. She has stabilized emotionally and

12

the therapist has discharged her from treatment. The child is thriving and "feels safe". Ballesteros spoke of attending the visits between Dawn and her mother, noting that "there was not really contact between mom and child." Dawn would talk with Ballesteros or the case worker. Ballesteros described the circumstances in July 2013, one month before the trial reconvened, when Mother sat with her back toward the playground where Dawn was playing. The child stayed by her mother for about five minutes and then headed toward the case worker and Ballesteros. Mother had her cell phone out and was talking or texting. About 25 minutes before the end of the visit, one of Mother's friends appeared and "they started talking amongst themselves and whispering stuff to each other in the ear, and no contact was made with [Dawn]." There were missed visits after that. Initially when her mother failed to show up, Dawn became agitated and anxious. More recently, she had become immune to her mother's absence and inconsistencies. She doesn't cry anymore and she doesn't bite her fingernails as much. Ballesteros has also visited Dawn's day care where they played Cinderella and built castles. Ballesteros pretended she was Cinderella's fairy godmother. She asked Dawn who would live in the castle and the child answered that "she wanted to live with her grandparents in this castle every day." Ballesteros spoke with the teacher who advised that Dawn returned from visits with her mother in a negative and aggressive state. In her view, Dawn needs something permanent and consistent. She needs a stable and healthy home.

Dawn has, in her own child-like way, expressed her desires. She wants to live in the castle with her grandparents. Her emotional needs have improved, and her therapist has discharged her. We compare that with the teacher's statements that visits with her mother have had negative results. The emotional and physical dangers to the child now and in the future are enormous given Mother's and Father's track record and their failure to address their own

13

parental shortcomings. Mother is a victim and, according to the older children, an abusive parent. Father is abusive to Mother and four of the children. He remains in the picture -- with Mother's approval and consent -- despite having his own parental rights terminated. Dawn has witnessed the violence first hand, relating that "Dada hit Momma." While a number of programs were made available to assist Mother in protecting her child, she rejected them all. She did not pursue a protective order. She did not seek victim assistance. Indeed she offered no plans whatsoever for the future. The trial court was offered the best view of Mother's credibility as her story changed throughout trial. According to Mother, other people pressured the children to report violence. Father has never been abusive to anyone. She didn't remember the events leading to police calls. She had not reported all of the highly specific acts of violence. Someone else filled out the paperwork. As for the stability of Mother's home, she has repeatedly dated, and married, abusive men since high school. What we can glean quite clearly from her testimony is that Mother is bent on protecting Father and she has sacrificed all five of her children in the process. Her acts and omissions demonstrate that the existing parent-child relationship is not a proper one. The last *Holley* factor requires us to identify any excuses for Mother's acts or omissions. We fully recognize that she is herself a victim of abuse but the cycle has become self-perpetuating. *See In re R.F.,* 115 S.W.3d at 812 (holding evidence supported the jury finding that termination was in the children's best interest despite the mother's own physical and sexual abuse as a child). While she has completed counseling and therapy, she remains in denial. This is consistent with her therapist's report concerning scores on the MCMI-III. Dr. Schutte noted that "the validity scales of this objective measure of personality and psychopathology indicate that the client responded to the test questions in a highly defensive manner, tending to deny even minor problems most people are willing to acknowledge." He

14

concluded that her profile likely appears more favorable than is actually the case. Moreover, we reiterate that she still faces four counts of injury to a child.

Against this backdrop, we consider the stability of the proposed placement. The grandparents want to adopt this child. Dawn is thriving and feels safe. She speaks of her attachment to Grandpa "B" and the trips they take together. She has bonded to them. Her case worker, attorney ad litem, and the CASA volunteer all believed that termination was in Dawn's best interest. We agree. For all of these reasons, we conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination is in Dawn's best interest. We overrule the sole issue and affirm the trial court's judgment.

December 5, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.