# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00527-CV

---

**M. J., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 119TH DISTRICT COURT OF RUNNELS COUNTY
### NO. 974, THE HONORABLE GARY L. BANKS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Mother[1] appeals from the district's court order terminating her rights to her daughter, A.J., who was eight years old at the time of trial. *See* Tex. Fam. Code § 161.001(b)(1)(E) (conduct endangering child), (L) (criminal responsibility for serious injury to child), (O) (failure to comply with service plan), (b)(2) (best interest of child). We will affirm.

## BACKGROUND

The Department of Family and Protective Services initiated the present case with Mother and A.J. in September of 2018 when A.J.'s older brother ("Brother") called 911 to report that A.J. had sustained injury when Mother struck A.J. in the head with a large pot or pan. The

---

[1] We use pseudonyms to refer to the subject child, her siblings, her biological parents, and her foster parents. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The district court also terminated Father's parental rights. He was incarcerated at the initiation of this case and in a "halfway house" when he testified at trial. He did not challenge the termination below and he has not filed an appeal.

Department had provided services to Mother off and on since 2000.[2] Its first involvement with A.J. was during her infancy following a report of a violent altercation between Mother and Father in 2012. That case ended in Mother, Father, and Father's parents being named co-conservators, with the grandparents named as the conservators with the right to designate the primary residence. That conservatorship was still in place at the outset of this case.

The Department assigned Anthony Delagarza to investigate the present case and Krysta Whitehead to serve as caseworker. Delagarza interviewed A.J., who complained that Mother had struck her in the head with a pot or pan, and both Delagarza and Whitehead confirmed the existence of an egg-sized knot on the back of A.J.'s head. Mother conceded that A.J. had been stricken by a "small saucepan" but indicated it was an accident that occurred when the pan "bounced off" the kitchen sink. Based on the interviews and Mother's history with the Department, Delagarza and Whitehead classified A.J.'s case as "high risk" and contacted A.J.'s grandparents to find a safe place for A.J. and her brother to stay while the Department investigated the case. Whitehead initially placed Mother on a safety plan without removal but formally removed A.J. and Brother when Mother failed to comply with the safety plan by seeking contact with A.J. and Brother in contravention of the plan's provisions.

In April of 2019, the Department filed an Original Petition for Protection of a Child and Suit Affecting the Parent-Child Relationship, seeking to terminate Mother's and Father's parental rights. Separately, a grand jury considered the allegations that Mother had stricken A.J. with a pot or pan and indicted her for injury to a child in violation of Texas Penal

---

[2] It is unclear from the record how many children Mother has or what their respective ages are. A.J. has at least two siblings: Brother, who was originally a subject of the termination petition but who aged out during the pendency of the case; and Sister, an adult who spoke to caseworkers regarding A.J.'s relationship with Mother.

Code Section 22.04(f). The court presiding over the criminal charges placed Mother on two years of community-based pretrial intervention.

In June, the district court held a hearing on temporary orders and then issued orders naming the Department as temporary managing conservator of A.J. and Brother. The orders allowed Mother limited, supervised visitation with the children.

In July, the Department filed its family-service plan for Mother. With respect to Mother's cooperation with the Department, the plan complained:

> [M]om seems to think it[']s funny to break rules like [Brother] going to her house when it's not allowed. Mom [is] taking things lightly, may not understand the seriousness of CPS involvement. Mom has sent screens shots of her trying to have contact with [A.J.] like video chats and tell [A.J.] I said hi. It looks like mom is having someone go into the home and try to break the court orders. . . . Mom seems to be minimizing the physical abuse that has gone on in the home and actually denies what she has told to other CPS staff. Mom has been physically abusing with both [A.J. and Brother]. Kids have stated mom has hit, punch[ed], kick[ed], thrown things. [There is a] pending criminal case but mom denies the seriousness of this.

The complaint concluded, "Mom seems to have an excuse for everything [and] is not accepting responsibility for her actions . . . ." The service plan required Mother to attend all scheduled visitations, maintain a safe and stable home, maintain a legal source of income, refrain from using drugs or associating with those who do, complete a mental-health evaluation, submit to random drug tests, and require any adult household members to complete the same services expected of her.

In August, fictive kin Thomas and Kirsten Adam filed a petition in intervention seeking to be named joint managing conservators with the exclusive right to designate A.J.'s primary residence. The Adams had cared for A.J. during the pendency of the 2012 case and had maintained contact with A.J.'s family thereafter, with A.J. living with the Adams in an informal

3

arrangement during much of 2016.  The Department ultimately placed A.J. with the Adams in October of 2019, and the Adams hoped to adopt A.J. at the conclusion of the termination proceedings.  But as the case progressed, the Department acknowledged Mother's good-faith efforts to comply with the family-service plan and changed its recommendation from termination to joint conservatorship with the Adams, with the Adams as the proposed permanent managing conservators with the right to designate the residence.  The Adams then filed a counter-petition requesting termination of Mother's rights.  *See id*. § 102.005(3) (affording certain individuals with actual possession of child standing to seek termination).

## BENCH TRIAL AND RESULTING ORDER

The case proceeded to bench trial in August of 2020.[3]  The Department, as petitioner, called a single witness—Krysta Whitehead, the caseworker initially assigned to A.J.'s case.  The Adams, as counter-petitioners, called nine additional witnesses:  Kelsie Downes, who worked on the case from "roughly" August to November of 2019; Melissa Mares, who served as caseworker from February of 2020 through the trial date; Addison Briscoe, a Department caseworker who looked into concerns about Mother's welfare; Anthony Delagarza, who had investigated on behalf of the Department; Lisa Wallace Williard, a family-services provider for the Department; Lori Hollingsworth, a licensed counselor that worked with A.J.; Father, as respondent; Mother, as respondent; and Kirsten Adam, as counter-petitioner.  Mother called only one witness—herself—to the stand.

Whitehead testified first and spoke primarily of Mother's compliance with her service plan and A.J.'s desire for placement.  When asked to go through the service goals one by

---

[3] The trial was held remotely by videoconference due to the COVID-19 pandemic.

one, Whitehead indicated that Mother had complied with each requirement. When asked "if there was anything that [Mother] ha[d] not complied with," Whitehead answered in the negative. She noted, however, that the visitations had become "shorter" and more difficult once they transitioned to a virtual platform due to COVID-19, and said that A.J. repeatedly indicated she did not want to talk with Mother, leading Whitehead to "suspend" the visits. She also noted that, when asked about what she wanted for her future, A.J. "wanted to become [A.J.] Adam." Whitehead described a "very close bond" between A.J. and the Adams and agreed that the child was "thriving" in the placement, even referring to Kirsten as "mom." She nevertheless said the Department recommended that Mother maintain her parental rights and have visitation with A.J.

Downes testified about her work as Department caseworker from "roughly" August to November of 2019. She testified that she had drafted Mother's family-services plan and that Mother was initially highly resistant to the plan. Downes indicated, however, that over time Mother became generally compliant with that plan. Yet Downes expressed concern that Mother was not progressing with her mental-health treatment in that Mother "refused to acknowledge" her role as an abuser, notwithstanding reports of abusive incidents from several different individuals. She also testified as to A.J.'s behavior during in-person visitation, explaining, "And, so, she came to the visit, was kind of—she didn't want to hug Mother. She was really standoffish. She talked to her, but she was really—she just seemed really nervous about it." Downes then explained that this was typical of the visits and that A.J. ultimately indicated she did not wish to visit with Mother at all.

Mares served as the family's caseworker from February through the date of trial. She testified that A.J. "wasn't very affectionate" during her visitations with Mother and that when Mares and A.J. would meet in private, A.J. "never brought [Mother] up" but instead would

5

need prompting to discuss Mother. She said A.J. was "confused" when Mares would refer to Mother as A.J.'s mom because A.J. only ever referred to Mother by Mother's given name. She said that A.J. instead refers to the Adams as "mom" and "dad" and refers to the Adams' sons as her "brothers." Mares indicated that A.J. is "spunky" and "always happy" when in the Adams' presence. She concluded by saying that the Adams' proposal of termination and adoption—as opposed to the joint conservatorship proposed by the Department—would be "the most permanent outcome" possible for A.J.

Briscoe testified that she specializes in adult protection for the Department and received a report during the pendency of the case that Mother may need a welfare check. Upon investigation, Briscoe found Mother "unable to meet her own needs." She also observed several visits between Mother and A.J. and deemed those visits unsuccessful. On the whole, Briscoe classified Mother as "partially compliant" with her service plan. Counsel followed up by asking Briscoe, "[D]o you feel like [Mother], based on the services she has worked, has made the requisite lifestyle changes for [A.J.] to return to her care?" Briscoe responded in the negative. She acknowledged, however, that the Department had recently changed its goal in the case from "termination and adoption" to designation of the Adams as primary managing conservators. When asked why, Briscoe explained that Mother had "gotten closer to completing her services." She indicated that she was uncertain as to whether the Department had complied with statutory prerequisites for naming non-parents as primary managing conservators. *See* Tex. Fam. Code § 263.408. She also conceded that she was uncertain as to whether the Adams, who desired termination, would even agree to the Department's amended proposal.

6

Delagarza testified as to Mother's "extensive CPS history,"[4] saying that he had personally investigated reports involving Mother's family as early as 2010, when the Department received a report of a violent encounter between Brother and one of Mother's domestic or romantic partners. Delagarza reported that they take this kind of history into account when investigating a new case. He testified that, during his interview with A.J. in 2018 regarding the incident in the kitchen, Brother and Sister both made outcries of abuse, with Brother indicating that Mother had "hit" A.J. "in the face" until her nose bled on at least three occasions. These and other factors are what led Delagarza and colleagues to classify A.J.'s case as "high risk."

Williard testified about providing family-based services to Mother. She said that, at her initial visit with Mother, Mother had shown her the pan that allegedly caused the injury and the kitchen where the injury occurred. Williard described it as "a small-to-medium heavyweight metal saucepan" and estimated that the pan must have "ricocheted" "at least four to five feet" to have caused the injury in the manner described by Mother. Williard summarized Mother's explanation by saying, "It did not seem plausible." She also said she had examined A.J. and physically confirmed the injury to A.J.'s head. She also noticed that A.J. "was in desperate need of dental care" but said that Mother refused to allow the Department to pursue that care. She said that two older siblings made outcries of abuse during her respective visits with them, with one saying Mother had left her with a black eye and the other saying Mother had left him with a bloody nose. Williard indicated that she was very concerned about the potential for abuse within the home, that A.J. repeatedly said she did not want to return to the home, and that Mother's "progress [on parenting skills] was limited" over the course of the case. She

---

[4] The Department admitted into evidence a two-page log outlining dozens of reports involving Mother dating back to 2000.

concluded that "it d[oes] not appear that [Mother] ha[s] the capacity to improve behaviors to ensure [A.J.'s] safety."

Hollingsworth testified that she has served as a licensed professional counselor for thirteen years and that she had been seeing A.J. "for one year and three months." She testified that the original "focus of the sessions was mainly [A.J.]'s behavior." When asked for clarification, Hollingsworth indicated that A.J. was reportedly exhibiting "rages of emotions, screaming and yelling, defiance behaviors, not following requests or expectations." She continued, "She had no boundaries for herself or others," and explained that A.J. was reportedly "wetting the bed frequently" and "having nightmares." She also described unusual eating habits in that A.J. would only eat "ramen noodles," "bagel bites," and "frozen pizzas." She summarized A.J.'s behavior at intake—at approximately age seven—as that typically seen in a two- or three-year-old child. Hollingsworth then described the techniques she used to help A.J. with her issues, which Hollingsworth attributed to long-term "trauma."

Hollingsworth further testified that as A.J.'s behavior improved, the focus of counseling turned to "transition[ing] into the [Adams'] household." She testified that she has not seen any of A.J.'s formerly erratic behavior in her life with the Adams, but that A.J. typically regresses for a short time when she visits with Mother. She reported that A.J., by the time of trial, was exhibiting behavior appropriate from children between "ages seven and twelve, where she is independent, trying to do things on her own, expressing herself, her needs." Hollingsworth noted that A.J. frequently experienced "frustration" at having to see Mother at all and had expressed that she did not wish to continue to do so. A.J. apparently expressed "relief" to Hollingsworth when she learned that the Department had suspended visitation altogether. Hollingsworth testified that she has seen "tremendous change" in A.J. since she moved in with

8

the Adams and that A.J. is "not bonded" to Mother. She closed by predicting that A.J. would "regress" if required to resume visitation with Mother pursuant to any kind of joint-custodianship arrangement between Mother and the Adams.

Father testified primarily of his inability to comply with his service plan while incarcerated and of his frustration with not being kept abreast of developments in the case. He reported that he did not even learn of the incident in the kitchen until "six months later." He said that he loves A.J. but conceded his inability to provide an appropriate home for her. He said he supports termination of all parental rights because he believes that the Adams can "provide" for A.J. and that "she is happy with them." He did not address Mother's ability to provide an appropriate home for A.J.

Mother testified and repeated her characterization of the incident in the kitchen, emphasizing that it was an accident. She conceded that A.J. had "a knot on her head" and that "EMS was called." She claimed to have thrown the pan into the sink with A.J. nearby but denied ever directing the pan "at" or "toward" A.J. Mother testified as to all the various homes A.J. has had since 2012 but denied that frequent relocation and recurring Department involvement "create[s] an unsafe and unstable environment." She conceded that A.J. has been with the Adams long enough to have made lots of "friends" and "connections" there. Mother also acknowledged that she had, at one point, "agree[d]" to allow the Adams to adopt A.J. but said that, at the time she made that statement, she did not understand that an open adoption would require termination of her own rights. When asked why she did not want termination, she replied:

> [A.J.] is my daughter. I love her. I carried her nine months. I've nursed her. She's my everything, as well as my other children. It's in her best interest for her

9

mother to always be in her life. I have no doubt that the Adams do love her, and she loves them, and they do care for her.

She indicated that she "want[s] permanency" for A.J. but wants to remain "part of her life."

Kirsten Adam testified that the Adams first met A.J. in 2012 when she was an infant, when the Department initiated an "emergency late-night placement" following the violent incident between A.J.'s parents. She described her first impression of the baby:

She had several needs. When she showed up, she was covered in scrapes and cuts because she had glass that had fallen from a car accident. She was also malnourished, and that was confirmed by a pediatrician. She was very thin for a baby of her age. . . . [T]here were definite confirmed signs that she was needing some extra attention.

She testified that A.J. had stayed with the Adams for around six months but that they had remained part of her life thereafter because they "loved her." She testified that A.J. came to live with them off and on and throughout the summer of 2016 because Mother contacted them "due to an inability to keep [A.J.] safe." At that point, she said, the Adams retained counsel and began considering guardianship or adoption. But shortly after the Adams enrolled A.J. in school in September of 2016, Mother disappeared with A.J. and refused to return her. Kirsten described herself and her family as "devastated" by the sudden change in plans—Mother had apparently previously agreed to allow A.J. to attend school with the Adams' children. Kirsten testified that the Adams then cut off all contact with Mother when they realized they had become little more than a "revolving door" for Mother to use at her convenience. A.J. did not reside with the Adams again until the Department's placement in October of 2019.

Kirsten then described what it was like to have A.J. back in their lives:

10

The re-introduction to [A.J.] in our lives in 2019 was hard. She was a different kid from what we had ever known. You could tell she had been through a lot. She had some bad habits. She could not distinguish between cuss words and regular words. She was a horrible eater. She had a very limited diet, and it was a diet of food that our family doesn't consume but on a very scarce basis. . . . She was very insecure. She struggled with doing anything independently, whether it be a simple task that a child her age should be able to do. She needed constant help with everything.

She also testified that A.J. was on "three medications"—one for attention-deficit hyperactivity disorder, one for insomnia, and one for mood disorders. She said that A.J. had fallen so far behind academically that they had to enroll her in special-education services at school.

When asked how A.J. had changed while in the Adams' care, Kirsten indicated that A.J. is now "bubbly," "spunky," "confiden[t]," and has turned back into "the [A.J.] [the Adams] used to know." Kirsten explained that A.J. is "very involved," "has a great group of friends," and has transitioned to "full inclusion" in general education at school. When asked about extra-curricular activities, Kirsten testified that A.J. enjoys ballet, cheer, tumbling, and wakeboarding. She testified that, based on her past experience trying to coordinate and facilitate meetings with Mother, any visitation on Mother's part would be detrimental to A.J.'s well-being. She testifed that termination and adoption is in A.J.'s best interest, and said that A.J. deserves permanency "more than any child [she's] ever known."

Following the trial, the district court entered a final termination order finding, in relevant part, that Mother had:

- engaged in conduct or knowingly placed the child, [A.J.], with persons who engaged in conduct which endangered the physical or emotional well-being of the child, [A.J.], within the meaning of Section 161.001(b)(1)(E), Texas Family Code;

- been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally

11

responsible for the serious injury of the child, [A.J.], under Section 22.04, Texas Penal Code, within the meaning of Section 161.001(b)(1)(L), Texas Family Code; and

- failed to comply with the provisions of a court order that specifically established the actions necessary . . . to obtain the return of the child, [A.J.] . . . within the meaning of Section 161.001(b)(1)(O), Texas Family Code.

The district court then found that termination is in A.J.'s best interest. Mother timely filed this appeal.[5]

## STANDARD OF REVIEW

To terminate a parent's rights to his or her child, the petitioner must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination and that termination is in the child's best interest. *See id.* § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm conviction or belief as to the truth of the allegations sought to be established." *See* Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In our review, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

---

[5] Mother named only the Department as appellee, and the Adams filed a brief as intervenors. Because none of the parties complains of the designation of the respective parties on appeal, and because that designation does not affect the disposition of the appeal, we will not conform the style to list the Adams, who prevailed in the proceedings below, as appellees rather than intervenors.

When evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible," *see id.*, but we need not disregard undisputed evidence contrary to the determination, *see K.M.L.*, 443 S.W.3d at 113. Evidence is legally sufficient unless after reviewing the evidence in the proper light, we conclude that no reasonable factfinder could have formed a firm belief or conviction that the Department carried its evidentiary burden. *See J.F.C.*, 96 S.W.3d at 266; *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied).

Evaluation of factual sufficiency requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *See In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "In a factual[-]sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard. *See K.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00116-CV, 2020 WL 4462320, at *4 (Tex. App.—Austin July 15, 2020, pet. denied) (mem. op.) (citing *In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.)).

13

## DISCUSSION

We will begin with Mother's sixth issue, in which she challenges the finding under Subsection (E) by arguing that the evidence is allegedly "insufficient to find that appellant mother engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the child." We disagree.

### Statutory Predicate

The trial court may order termination of the parent-child relationship under Subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(E). Subsection (E) focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *See V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, a *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). Thus, the Subsection requires proof of endangerment, which means exposing a child to loss or injury, or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Fam. & Protective Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698–99. A finding of endangerment requires more than the threat of metaphysical injury or ill effects from a less-than-ideal family environment, and the petitioner does not have to prove that endangering conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. Accordingly, evidence of domestic violence is evidence of endangerment, even if the violence is not directed at the child. *See J.G. v. Texas Dep't of Fam. & Protective Servs.*,

14

592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Finally, endangerment may be inferred from parental misconduct. *See A.C.*, 577 S.W.3d at 699.

The evidence of record is both legally and factually sufficient to support the district court's finding of endangerment. To begin with, it is undisputed that Mother injured A.J. with a metal pan. Mother contends that she did not intend to injure A.J. and that, although she concedes throwing the pan, she claims she did not direct it "at" or "toward" A.J. Even accepting Mother's characterization of the incident, the fact that she threw the pot in the kitchen, knowing A.J. was standing nearby, exposed the child to risk of physical injury. *See E.N.C.*, 384 S.W.3d at 803; *A.C.*, 577 S.W.3d at 699; *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *11, *13 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (holding unintentional act sufficient evidence of endangerment); *Hatley v. McCarter*, No. 05-97-01903-CV, 1998 WL 870881, at *9 (Tex. App.—Dallas Dec. 16, 1998, pet. denied) (mem. op.) (affirming termination based in part on endangerment where parent had told physician that he did not intend to harm child). Further, the district court, as factfinder, could find that Mother's version of the events was not credible, and we may not second-guess such a determination. *See A.B.*, 437 S.W.3d at 503.

Mother further contends that the kitchen incident is not alone sufficient to support a finding of endangerment under Subsection (E), but the record includes evidence of Mother's long history as a perpetrator of abuse. Both Brother and Sister made outcries indicating that Mother had injured them multiple times. And Brother indicated that Mother had struck A.J. in the face on at least three occasions, leaving A.J. with a nosebleed each time. Moreover, undisputed aspects of the record, including the Department's records and Mother's own testimony, reveal that Mother had violent relationships with at least two domestic partners,

15

thereby exposing her children to domestic abuse. These accounts suggest a long-term course of conduct that endangered A.J.

Other undisputed aspects of the record reflect a pattern of neglect that left A.J. at frequent risk of harm. Kirsten Adam testified that, when her family received six-month-old A.J. in the middle of the night in 2012, she was undersized, malnourished, and "covered in scrapes and cuts." Williard testified that six-year-old A.J. had not received appropriate dental care and that Mother refused to provide the insurance card necessary for the Department to obtain that care, thereby deliberately depriving A.J. of the care she needed. A.J.'s counselor testified that at ages six and seven, the child showed signs of trauma and exhibited behavior typically seen in a two- or three-year-old pre-schooler. She further testified that Mother had allowed A.J. to subsist on a junk-food diet consisting of only ramen noodles, bagel bites, and frozen pizza. Briscoe confirmed the culture of neglect, testifying that Mother could not even care for herself, much less a child. All this evidence supports a finding of endangerment. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) ("[N]eglect can be just as dangerous to the well-being of a child as direct physical abuse."); *In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *2, 13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (holding testimony regarding malnourishment and lack of medical care evidence of endangerment); *In re S.G.F.*, No. 14-16-00716-CV, 2017 WL 924541, at *6 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.) (mem. op.) (holding lack of medical care evidence of endangerment); *In re D.E.*, 761 S.W.2d 596, 599 (Tex. App.—Fort Worth 1988, no writ) (holding evidence of "lack of food," and lack of "parental care" in general, evidence of endangerment).

On this record, taking into account all the evidence before the district court, we cannot say that no reasonable factfinder could have formed a firm belief or conviction that

16

Mother engaged in conduct that endangered A.J.'s physical and emotional well-being.  The evidence is therefore both legally and factually sufficient to support the district court's finding under Subsection (E).  Because only one statutory predicate is necessary to justify a court's order of termination where there is also a finding of best interest, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we do not reach Mother's arguments regarding the other predicates but instead move to the question of A.J.'s best interest.

**Best Interest**

We review the district court's finding regarding A.J.'s best interest by considering the factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), taking into account: (1) the child's wishes, (2) her emotional and physical needs now and in the future, (3) any risk of present or future emotional or physical danger, (4) the parenting skills of anyone seeking custody, (5) any programs available to assist those seeking custody, (6) any plans for the child's future, (7) the stability of the proposed placement, (8) conduct by the parent that might show that the parent-child relationship is inappropriate, and (9) any excuses for the parent's conduct.  The *Holley* factors are not exhaustive, not all factors must be proven, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence is undisputed that the parental relationship endangered the safety of the child."  *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).  The child's need for permanence is the "paramount" consideration when determining her present and future physical and emotional needs.  *See L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.).; *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston

[14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1.

The first factor—the child's desire—weighs in favor of termination. Nearly every witness testified as to A.J.'s strong desire to stay with the Adams and her reluctance to even visit Mother. Hollingsworth testified that A.J. is bonded to the Adams but not to Mother, and at least two witnesses testified that A.J. had asked to change her surname to Adam.

The second factor—A.J.'s present and future needs—also weighs in favor of termination. The undisputed testimony of Kirsten Adam reflects that both times the Adams received A.J. from the Department after she had been in Mother's care, she arrived with significant unmet needs. And Williard testified that she found A.J. "in desperate need" of dental care, which Mother refused to facilitate. Her testimony suggests that A.J.'s physical, emotional, psychological, and academic needs are not met in Mother's care. *See D.N.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00092-CV, 2020 WL 4462327, at *8 (Tex. App.—Austin July 24, 2020, pet. denied) (mem. op.) (holding "neglect the children apparently suffered before their removal" constituted evidence that parent could not meet present or future needs).

The third factor—any risk of physical or emotional harm—weighs heavily in favor of termination. As outlined in our discussion of the statutory predicate, the record suggests that A.J., should she return to Mother, would be at serious risk of physical, emotional, and psychological abuse both now and in the future. *See Davis v. Travis Cnty. Child Welfare Unit*, 564 S.W.2d 415, 421 (Tex. App.—Austin 1978, no writ) ("The district court was in a position to

18

measure the future conduct of [parent and partner] by their recent past conduct as it might be related to the same or similar situation.").

The fourth factor—parenting skills of the adults in the proposed placement—also weighs in favor of the court's best-interest finding. The Department's status reports indicate that the Adams provide A.J. "with routine, structure, and age[-]appropriate non-physical discipline in a nurturing environment" and "with age[-]appropriate activities that stimulate her development." And Whitehead testified that A.J. is "thriving" under their care and supervision.

There is scant evidence regarding the fifth factor—any programs available to assist those seeking custody—but the record does reflect that the Adams have turned to counseling and to special-education services to help address A.J.'s needs.

The sixth factor—any plans for the child—weighs in favor of termination. Although Mother professed her love for A.J., she identified no plans for A.J. or her future. The record instead reflects that throughout A.J.'s life, Mother repeatedly reached out to the Adams for help meeting A.J.'s most basic needs. And Briscoe testified that she found Mother unable to plan even for her own immediate needs. *See id.* ("The court could have concluded that [parent], because she is unable to care for herself, is certainly in no position to take care of the children."). The Adams, meanwhile, have described and started executing a plan to get A.J. the treatment she needs, to help her improve academically, to introduce her to age-appropriate extra-curricular activities, and ultimately to adopt her.

The seventh factor—stability of the proposed placement—weighs in favor of termination and placement with the Adams. The record reflects that the Adams have been the lone consistent presence in A.J.'s eight years of life and have hoped to adopt her since at least 2016. Kirsten testified that A.J. has made a "great group of friends" to anchor her through this

19

transition, and even Mother conceded that A.J. had made strong "connections" in that community due to the number of times she had lived with or visited the Adams.

The eighth factor weighs in favor of termination, as the record contains extensive evidence that the parent-child relationship was not a proper one. Multiple witnesses testified that A.J. referred to Mother by her given name, instead of as "mom" or "mommy." Kirsten Adam testified that Mother has subjected A.J. to so much profanity that A.J., when the Adams received her in 2019, could no longer differentiate between profane and socially acceptable speech. A.J.'s counselor testified that, upon meeting the six-year-old child, she realized that A.J. had grown so accustomed to feeding herself that she would eat dry, uncooked ramen noodles straight from the package. The counselor also testified that A.J., at nearly seven years of age, was not yet properly toilet trained. All this evidence—in addition to the evidence of long-term abuse—suggests the parent-child relationship was improper. *See A.C.*, 560 S.W.3d at 634 (describing lack of "adequate parenting abilities" as evidence of improper relationship).

The ninth factor requires us to consider any excuses for the parent's conduct. Mother testified that most of the abuse in her household was originally caused by her relationships with violent men and said that she had not been involved in any relationship— violent or otherwise—in at least eight years, thereby ostensibly reducing or eliminating the abuse in the household. But even accepting her characterization of her relationships, her proffered justification does not address the overwhelming evidence of Mother's consistent neglect of A.J.'s physical, emotional, and academic needs. Moreover, the record includes evidence that Mother herself was often the perpetrator of abuse, and the district court—as the factfinder in this case— was free to weigh the credibility of Mother's testimony, *see A.B.*, 437 S.W.3d at 503; *J.P.B.*, 180 S.W.3d at 573, and ultimately reject her excuses for the violence and neglect that A.J.

20

suffered, *see D.G. v. Texas Dep't of Fam. & Protective Servs.*, 440 S.W.3d 844, 853 (Tex. App.—El Paso 2013, no pet.) (rejecting similar excuse where mother "herself [was] a victim of abuse . . . but was in denial as to her role as abuser").

Because the evidence regarding the *Holley* factors, 544 S.W.2d at 371–72, when considered in light of A.J.'s "paramount" need for permanence, *D.R.A.*, 374 S.W.3d at 53, would allow a reasonable factfinder to develop a firm belief or conviction that termination of Mother's rights is in A.J.'s interest, the evidence is both legally and factually sufficient to support that determination.

## CONCLUSION

We affirm the district court's order of termination.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:  March 19, 2021